534 S.E.2d 452 (2000)
243 Ga. App. 732
In the Interest of V.M.T., a child (Two Cases).
Nos. A00A0480, A00A0481.
Court of Appeals of Georgia.
April 28, 2000.
*453 David J. Casey, Bobby G. Adkins, Jr., Marietta, for appellant (case no. A00A0480).
Baskin & Baskin, Brenda Godfrey, Joseph T. Justice, Marietta, for appellant (case no. A00A0481).
Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen A. Sgrosso, Assistant Attorney *454 General, Sanders B. Deen, Marietta, for appellee.
RUFFIN, Judge.
By order dated April 15, 1999, the Cobb County Juvenile Court terminated the parental rights of V.M.T.'s parents. In Case No. A00A0480, the father appeals, and in Case No. A00A0481, the mother appeals. As both appeals involve the same operative facts, we have consolidated the cases, and we affirm.
V.M.T. was born on November 25, 1996. At that time, V.M.T.'s parents, who were unmarried, lived with the father's family. On or around January 17, 1997, the mother noticed that her baby's head seemed swollen, but she did not take her to the hospital. On January 19, 1997, the grandmother noticed that V.M.T. was "just limp" and "knew something was wrong with her." The grandmother then called 911, and paramedics took V.M.T., who was in cardiac arrest, to Scottish Rite Hospital. At the hospital, doctors discovered that V.M.T. had a skull fracture, nine broken ribs, and two broken legs. As a result of her massive injuries, V.M.T. must use a feeding tube. She is brain-damaged and unable to walk or see.
On January 21, 1997, the juvenile court concluded that V.M.T. was deprived and entered an order placing her in the temporary custody of the Department of Family & Children Services (DFACS). A citizen review panel convened to review the case and, in a May 1997 report, recommended that the parents' rights be terminated. However, DFACS declined to pursue termination pending the outcome of a criminal investigation and focused on long-term foster care instead.
DFACS developed several case plans that included rehabilitative steps for the parents. The case plans, which were in place from February 1997 through July 1998, required, among other things, that the parents pay child support, attend parenting classes, obtain counseling, and sign a release so that V.M.T. could obtain needed medical treatment. The case plan in effect from January through July 1998 also required the father to legitimate V.M.T.
On January 14, 1999, DFACS filed a petition requesting termination of the parents' rights. DFACS based the petition, in part, on the parents' failure to comply with the case plan and on the parents either having caused V.M.T.'s injuries or having negligently allowed the infant to receive such injuries. The termination petition also notified the father that his parental rights would be terminated if he failed to file a petition to legitimate V.M.T. within 30 days.
The hearing took place on April 9, 1999. Before the hearing, the juvenile court learned that the father had not filed a petition to legitimate V.M.T., and it terminated his parental rights in accordance with OCGA § 15-11-83.
At the hearing, the mother testified that, although she had been V.M.T.'s primary care giver and had been with the baby almost continuously during the week prior to January 19, 1997, she did not know how her child had been injured.[1] Indeed, until V.M.T.'s paternal grandmother called 911, the mother did not know that there was anything wrong with her child. The mother suggested that someone else who lived with the father's family may have injured the child. She testified that she no longer lived with that family. But V.M.T.'s paternal grandmother testified that the mother continued to live part of the time with the father's family.
With regard to the case plans, the mother said that she had complied with the plans in that she had visited her child, gone to the physical therapy appointments, attended counseling, and taken parenting classes. She admitted, however, that despite holding a job, she never provided any child support.
In an order dated April 14, 1999, the juvenile court found that V.M.T. had been physically abused and that, even if the mother did not cause the abuse, she had failed to protect her child. Although the mother claimed that she no longer lived in the house where the child had been injured, the court found otherwise. The court also found that, despite *455 V.M.T.'s life-threatening injuries, the mother was unable to recognize that her child was in danger. Accordingly, the juvenile court terminated the mother's parental rights.
Case No. A00A0480
1. In two enumerations of error, the father contends that the juvenile court erred in terminating his parental rights pursuant to OCGA § 15-11-83. We disagree.
OCGA § 15-11-83 provides that if a child is born out of wedlock, the biological father shall be notified of a petition to terminate parental rights and shall be advised that, if he does not file a legitimation petition within 30 days of receiving notice, he will lose all rights to the child.[2] It is undisputed that the father never sought to legitimate V.M.T.
(a) On appeal, the father argues that he is illiterate and the juvenile court failed to establish that he understood what steps he needed to take to legitimate his child. Thus, the father maintains that he was not afforded sufficient notice. However, the father never raised either his alleged illiteracy or the sufficiency of notice at trial, and we will not address any issue raised for the first time on appeal.[3]
(b) The father also asserts that the juvenile court erred in failing to declare OCGA § 15-11-83 unconstitutional. According to the father, the statute violates principles of equal protection because it places a burden on fathersbut not mothersto legitimate children born out of wedlock. Again, we disagree.
"As an initial matter, we note that this Court is generally without jurisdiction to rule on the constitutionality of a statute."[4] But this Court does have jurisdiction to address constitutional issues where "the case requires merely an application of unquestioned and unambiguous constitutional provisions."[5] Such is the case here.
In the recent case of In the Interest of D.B.,[6] this Court recognized the constitutionality of OCGA § 15-11-83. Although we did not explicitly address equal protection principles, it is clear that requiring fathers of children born out of wedlock to legitimate their children in order to preserve their parental rights does not violate equal protection because unwed fathers and unwed mothers are not similarly situated.
The first step in any equal protection analysis is to determine whether the alleged constitutional violation involves similarly situated individuals.[7] An unwed mother who gives birth to a child and whose name generally appears on the child's birth certificate is not similarly situated to an unwed father who may remain anonymous unless he takes affirmative steps to claim his child.[8] Indeed, under OCGA § 19-7-25, until an unwed father legitimates his child, the mother retains all parental control over that child.[9] It follows that OCGA § 15-11-83, which distinguishes between unwed mothers and unwed fathers, does not violate equal protection principles.
2. In view of our holding in Division 1, we need not address the father's remaining enumerations of error.

*456 Case No. A00A0481

3. In two enumerations of error, the mother challenges the sufficiency of the evidence supporting the juvenile court's determination to terminate her parental rights. In reviewing a juvenile court's decision to terminate parental rights, we view the evidence in the light most favorable to the appellee and determine whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[10] In so doing, "[w]e do not weigh the evidence or determine the credibility of witnesses, but defer to the juvenile court's factfinding."[11]
A termination of parental rights case involves a two-step analysis. First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[12] If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[13]
In this case, there was ample clear and convincing evidence of the four factors required to establish parental misconduct or inability. First, the mother never appealed the juvenile court's January 21, 1997 deprivation order, and "[t]he unappealed deprivation order[ ] of the juvenile court [is] sufficient to establish that [the child] was deprived within the meaning of OCGA § 15-11-81(b)(4)(A)(i)."[14]
As to the second factor, in determining whether V.M.T. was without proper parental care and control, the juvenile court could consider "evidence of past egregious conduct of the parent toward the child ... of a physically ... cruel or abusive nature."[15] Here, V.M.T. was undeniably subjected to extreme physical abuse while in her mother's care. Even if the mother did not cause the injuries, the juvenile court was authorized to conclude that the injuries were attributable to her inability to protect her child, which also constitutes lack of proper parental care and control.[16]
The record also demonstrates that the deprivation is likely to continue. As a result of her injuries, V.M.T. is unable to see, walk, or eat. The DFACS caseworker testified that whoever cares for V.M.T. will require specialized training to cope with her disabilities. A mother who is unable to discern when her child has sustained life-threatening injuries lacks the fundamental skills required to parent such a special needs child. A juvenile court is under no obligation to return the child to her mother "until she suffers [a] seemingly inevitable serious injury or death."[17] In view of V.M.T.'s special needs, there is no question that continued deprivation would likely cause her serious physical harm.
Finally, the evidence also supports the juvenile court's determination that termination is in the best interest of V.M.T. The same factors that show parental misconduct or inability can support a juvenile court's finding that termination of parental rights is in the child's best interest.[18] Given *457 the mother's failure to protect her child, her inability to discern serious injury, and her continued presence in the home where the child was injured, the juvenile court was authorized to conclude that the best interest of V.M.T. would be served by terminating the mother's parental rights. Accordingly, we affirm the juvenile court's termination of the mother's parental rights.[19]
Judgments affirmed.
ANDREWS, P.J., and ELLINGTON, J., concur.
NOTES
[1] Shortly before the hearing in this matter, the mother was arrested on charges of cruelty to children stemming from the injuries V.M.T. sustained in January 1997.
[2] OCGA § 15-11-83(e), (h).
[3] In the Interest of K.A.C., 229 Ga.App. 254, 255(2), 493 S.E.2d 645 (1997).
[4] Helmeci v. State, 230 Ga.App. 866, 868(1), 498 S.E.2d 326 (1998).
[5] Zepp v. Mayor &c. of Athens, 255 Ga. 449, 451(2), 339 S.E.2d 576 (1986).
[6] 243 Ga.App. 473, 533 S.E.2d 737 (2000).
[7] See Etkind v. Suarez, 271 Ga. 352, 355(3), 519 S.E.2d 210 (1999) ("The Equal Protection Clause of both the Federal and Georgia Constitutions requires that similarly situated individuals be treated in a similar manner."); see also Zach, Inc. v. Fulton County, 235 Ga.App. 478-479(1), 509 S.E.2d 746 (1998).
[8] See Parham v. Hughes, 441 U.S. 347, 355-356, n. 7, 99 S.Ct. 1742, 60 L.Ed.2d 269 (1979) ("That the child is the child of a particular woman is rarely difficult to prove. Proof of paternity, by contrast, frequently is difficult when the father is not part of a formal family unit.") (punctuation omitted).
[9] See Quilloin v. Walcott, 238 Ga. 230, 233, 232 S.E.2d 246 (1977), aff'd, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (ruling that Code Ann. § 74-203, the predecessor statute to OCGA § 19-7-25, did not violate equal protection principles).
[10] In the Interest of E.C., 225 Ga.App. 12, 13, 482 S.E.2d 522 (1997).
[11] In the Interest of B.L.S., 239 Ga.App. 771, 521 S.E.2d 906 (1999).
[12] OCGA § 15-11-81(b)(4)(A)(i)-(iv); see also In the Interest of F.C., 239 Ga.App. 545, 521 S.E.2d 470 (1999).
[13] Id.; OCGA § 15-11-81(a).
[14] In the Interest of A.C., 234 Ga.App. 717, 719, 507 S.E.2d 549 (1998).
[15] OCGA § 15-11-81(b)(4)(B)(iv).
[16] See In the Interest of G.T.T., 199 Ga.App. 706, 708(2), 405 S.E.2d 750 (1991).
[17] In the Interest of K.R.C., 235 Ga.App. 354, 355(1), 510 S.E.2d 547 (1998).
[18] In the Interest of B.P., 207 Ga.App. 242, 245, 427 S.E.2d 593 (1993).
[19] See In the Interest of R.M., 232 Ga.App. 727, 729, 503 S.E.2d 635 (1998).