573 S.E.2d 481 (2002)
258 Ga. App. 211
In the Interest of J.H., a child.
No. A02A1151.
Court of Appeals of Georgia.
October 31, 2002.
*482 Faye E. Hays, Jonesboro, for appellant.
Thurbert E. Baker, Atty. Gen., Shalen S. Nelson, Laura W. Hyman, Asst. Attys. Gen., Crumbley & Crumbley, McDonough, Jason T. Harper, for appellee.
MIKELL, Judge.
J.H.'s mother appeals the juvenile court's order terminating her parental rights, challenging the sufficiency of the evidence. Because clear and convincing evidence was not presented to show that J.H.'s continued legal relationship with her mother was likely to harm the child, we reverse. We emphasize that our decision relates only to the continuation of a legal relationship between mother and child and is not intended to suggest that J.H. should be returned to her mother's custody. The evidence shows that placing the child in the custody of her mother would be likely to harm the child physically and emotionally.
On appeal from an order terminating parental rights, we determine whether a rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost.[1] We view the evidence in a light most favorable to the appellee and defer to the lower court's factfinding.[2]
Viewed most favorably to the appellee, the Georgia Department of Human Resources, the evidence shows that J.H. was removed from her mother's custody on her ninth birthday, October 18, 1999, after the Henry County Department of Family & Children Services (the "Department") received a report that the child's uncle, who was a violent drug addict, had threatened to cut J.H.'s head off while holding a knife to her throat. The uncle lived in a camper behind the home in which J.H. resided with her mother, grandmother, aunt, and cousins. At a hearing held on October 21, 1999, the aunt testified that she witnessed the incident and told the uncle to stop, but he threatened her as well. J.H.'s aunt testified that the mother was not at home during the incident. In response to the court's questioning, the mother stated that she declined to prosecute her brother under pressure from her mother.
The caseworker who investigated the home testified that the mother and aunt appeared intoxicated and were asked to submit to drug and alcohol testing. The caseworker testified, and the mother admitted, that she registered 0.133 on a breathalyzer test. According to the caseworker, the mother's drug test was positive for cocaine. The mother attributed the positive result to being around the uncle and his girlfriend when they smoked cocaine.
The caseworker further testified that the mother's criminal history included several DUIs and a charge of simple battery resulting from an altercation in the home. The mother admitted the altercation as well as having "a drinking problem" and bipolar disorder. The mother also testified that although she had not worked in the previous seven months, she had been a bartender for fourteen years, and working around alcohol did not impede her recovery. Additionally, evidence was presented that J.H. had been *483 sexually abused in the home five years earlier and had been in counseling, but the mother had stopped taking her. After hearing the evidence, the juvenile court awarded temporary custody to the Department.
On November 29, 1999, the court ordered the mother to comply with a reunification plan, which required her to cooperate and maintain contact with the Department, maintain contact with the child, achieve mental stability, financially support the child, obtain and demonstrate parenting skills, and become free of substance abuse. On April 25, 2001, the Department filed a petition seeking to terminate the mother's parental rights, asserting that she had failed to comply with the goals of her case plan.
The termination hearing, originally set for July 27, 2001, was rescheduled for September 28, 2001, because of insufficient notice to the mother.[3] At the hearing, the Department's sole witness was caseworker Rachel Jean Reynolds, and she testified only concerning the mother's compliance with the reunification plan.
As to the first goal, cooperate and maintain contact with the Department, the first step outlined in the plan required the mother to report any changes in her address, telephone number, and employment status. According to Reynolds, the mother failed to contact the Department from November 5, 1999, until October 12, 2000, when she attended a citizens review panel. Moreover, attempts to reach her at the new address and telephone number she supplied at that time proved fruitless. The mother made no further contact with the Department until June 22, 2001, when she came in to apply for disability benefits. The second step required the mother to attend court hearings, panel reviews, and other conferences as requested by the Department. According to Reynolds, the mother attended two of three court hearings and two of five panel reviews, including the final review held on July 12, 2001. She failed to attend a family conference set for November 18, 1999.
The second goal of the case plan required the mother to maintain contact with the child by visiting her twice a week for two hours each time. Reynolds testified that the mother had 184 visitation opportunities but visited J.H. only sixteen times, missing periods of three and six months altogether. However, Reynolds also testified that the mother visited regularly with J.H. since July 2001.
Goal number three required the mother to be mentally stable. The mother was obligated to obtain a psychological evaluation by December 31, 1999, and to follow the recommendations of the evaluation. According to Reynolds, the mother failed to undergo the evaluation until August 23, 2001, and Reynolds did not receive a report until three days before the hearing. The plan also required the mother to continue counseling and take prescribed medication, and, on cross-examination, Reynolds admitted that a counselor at the McIntosh Trail Mental Center had verbally informed her that the mother had attended counseling sessions there.
Reynolds next testified that the mother failed to meet the fourth goal, financially supporting the child. The mother did not maintain an income, as she failed to qualify for disability benefits or to obtain employment, and she did not pay child support. An affidavit tendered into evidence indicated that the Department's child support enforcement unit had been unable to locate the mother as of September 20, 2001, and accordingly, no order for support had been established. The mother was also required to maintain suitable housing for herself and J.H. and provide evidence that she timely paid utility bills for a period of six months; according to Reynolds, she failed to do so.
The next goal, demonstrating parenting skills, required the mother to take parenting classes and provide a certificate of completion of such classes. Reynolds testified that she had received no evidence that the mother had taken parenting classes. The sixth goal required the mother to become free of substance abuse. This goal had three steps: obtain a substance abuse assessment, follow the recommendations of that assessment, and submit to random drug screens. According *484 to Reynolds, the mother failed to obtain an assessment despite referrals from the Department. However, a drug screen performed two weeks before the hearing was negative.
The mother testified that she did not know that she was required to maintain contact with her caseworker. She further testified that beginning in 2000, she visited with J.H. "probably 80 times" but had not known to sign a log-in sheet at the home where J.H. had been placed. Regarding her lack of income, the mother testified that she could not work because she is "always at DFACS or at the counseling center." She also complained that the Department would not approve her working as a bartender. The mother next testified that she had attended 15 parenting classes at a Pentecostal church, although they were not classes to which the Department had referred her. Further, the mother testified that she takes medication regularly for her mental disorder and that she had attended substance abuse classes, but was unaware that she was required to notify the caseworker that she was doing so. Finally, the mother claimed that she had undergone a substance abuse assessment at the Department and that she had not consumed alcohol since October 2000.
On cross-examination, the mother testified that she missed visits with J.H. and failed to maintain contact with the Department because she was depressed; that she was arrested for DUI in 1999 and jailed for three months for a probation violation; that she has no home for J.H. except for her mother's house; that she made no attempt to pay child support; that she waited until just before the hearing to obtain a psychological evaluation because she was afraid she would be unable to complete the five-hour test; and that she could not remember the dates of the parenting classes or the names of the preachers who taught them. However, she recalled learning how to discipline a child.
Roy Denson, the mother's stepfather, testified on her behalf that twice each week, or on at least 20 occasions, he drove her to and from the McIntosh Trail Mental Center. He also testified that he transported her to a church to attend parenting classes. J.H.'s grandmother testified that J.H.'s mother was sober and taking her medication.
The decision to terminate parental rights is a two-step process. First, the juvenile court must determine whether there is present clear and convincing evidence of parental misconduct or inability.[4] If such evidence is found, then the court must determine whether termination of parental rights is in the child's best interest, considering her physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.[5] The determination of parental misconduct or inability is made by finding that (1) the child is deprived; (2) lack of proper parental care or control is causing the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child.[6] The mother has not challenged the existence of the first two factors. Therefore, our review is limited to determining whether clear and convincing evidence supports the juvenile court's findings as to the third and fourth factors. In this regard, because the child was not in the mother's custody, the juvenile court was also required to consider whether she failed significantly, for at least one year before the termination petition was filed, to maintain a meaningful, supportive parental bond with the child, to support the child financially, or to comply with the court-ordered reunification plan.[7]
The mother argues that based on the evidence of her current sobriety and attendance at counseling sessions, the evidence does not clearly and convincingly show that the cause of the deprivation is likely to continue. In support of this position, the mother cites In the Interest of N.F.R.,[8] a case in *485 which we held that the evidence did not warrant termination because the mother had "demonstrated significant progress in overcoming her prior substance abuse problems and had obtained permanent employment and stable housing."[9] In the instant case, while we laud the mother's efforts to rehabilitate herself, she demonstrated no prospect of providing financial support for her child or a home other than one fraught with the threat of violence. In addition, since the reunification plan was implemented, the mother had been arrested for DUI and jailed for three months for a probation violation, yet she could not understand why she should not work as a bartender. Moreover, the mother failed to obtain substance abuse and psychological assessments in a timely fashion, failed to communicate with the Department, and missed significant visitation with her child, all as required by the case plan. Although the mother visited regularly with J.H. since the termination hearing was originally scheduled, the parent's past conduct is properly considered in determining whether the cause of the deprivation is likely to continue.[10] Based on the evidence of the mother's past behavior, her inability to provide a home or support for J.H., and her failure to comply with significant portions of her case plan, we find that a rational trier of fact could have found by clear and convincing evidence that the causes of J.H.'s deprivation were likely to continue.
However, insufficient evidence was presented to show that continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. Reynolds, the Department's only witness, did not testify that J.H. had suffered or was likely to suffer any harm from a continued relationship with her mother, that J.H. was harmed by being in foster care, or that she would suffer harm if she did not find permanent placement.[11] Indeed, J.H.'s grandmother testified that the child "worships her mother" and wanted to come home. Moreover, although the juvenile court concluded that continued deprivation is likely to harm J.H., the order does not contain an explicit factual finding supporting that conclusion. "For this reason alone the termination order must be reversed."[12]
Judgment reversed.
ANDREWS, P.J., and PHIPPS, J., concur.
NOTES
[1] In the Interest of V.M.T., 243 Ga.App. 732, 735(3), 534 S.E.2d 452 (2000).
[2] Id.
[3] The putative father's parental rights were terminated on July 27, 2001. Also, it appears that the mother gave birth in July and that the Department was granted custody of the baby.
[4] OCGA § 15-11-94(a).
[5] OCGA § 15-11-94(a); see In the Interest of V.M.T., supra at 736(3), 534 S.E.2d 452.
[6] OCGA § 15-11-94(b)(4)(A); In the Interest of B.F., 253 Ga.App. 887, 890, 560 S.E.2d 738 (2002).
[7] OCGA § 15-11-94(b)(4)(C)(i)-(iii).
[8] 179 Ga.App. 346, 346 S.E.2d 121 (1986).
[9] In the Interest of J.M.C., 201 Ga.App. 173, 174, 410 S.E.2d 368 (1991).
[10] Id.
[11] In the Interest of B.F., supra at 892, 560 S.E.2d 738; see also In the Interest of J.M., 251 Ga.App. 380, 383(4), 554 S.E.2d 533 (2001) (termination order reversed because no testimony presented that continued relationship with parent caused serious physical, mental, emotional, or moral harm to children); cf. In the Interest of M.C., 243 Ga.App. 707, 711(1)(d), 534 S.E.2d 442 (2000) (foster mother's testimony that child had nightmares concerning parents' alcohol and drug abuse and was hurt by father's lack of contact supported court's finding as to this factor).
[12] In the Interest of K.J., 226 Ga.App. 303, 307-308(2)(b), 486 S.E.2d 899 (1997).