A03A0009. IN THE INTEREST OF D. F. et al., children.
(582 SE2d 16)

ANDREWS, Presiding Judge.

This termination of parental rights case was previously before us. *In the Interest of D. F.*, 251 Ga. App. 859 (555 SE2d 225) (2001). There, this Court concluded that clear and convincing evidence did not support the juvenile court's finding in June 2000, that continued deprivation would "cause or is likely to cause serious physical, mental, emotional, or moral harm to the child[ren]." OCGA § 15-11-94 (b) (4) (A).

J. R. appeals the July 1, 2002 juvenile court order terminating her parental rights to D. F., I. F., and A. F.[1] following remand, a second petition to terminate her parental rights, and additional hearings held pursuant to *In the Interest of D. F.*, supra.

1. In her first and second enumerations, J. R. argues that the juvenile court erred in terminating her rights because the State did not prove parental misconduct or inability as required by OCGA § 15-11-94 and did not prove that termination was in the best interests of the children.

In *In the Interest of D. F.*, supra, however, this Court found that,

[t]he record shows that the Carroll County Department of Family & Children Services (the "Department" [or "DFACS"]) became involved with the mother and her three children in 1996. The mother was then 16 years old, and she required the Department's assistance in caring for her children. In 1997, the mother damaged her boyfriend's car, for which she was convicted of criminal trespass and placed on probation. In May and June 1998, the mother was jailed for violation of probation because she failed to perform commu-

---

[1] D. F., I. F., and A. F. are now, respectively, eight, seven, and five years old.

nity service. No one in the mother's family was willing to take her children when she was incarcerated, and so the Department assumed emergency custody. After a hearing, the juvenile court found in an unappealed order that the children were deprived and awarded temporary custody to the Department. The children have been placed in foster care. A caseworker testified that, before the mother was jailed, her parenting skills were not so poor that the Department would have been justified in removing the children from her custody. After the mother was released from jail, she agreed with the Department on a plan for her permanent reunification with the children. Under the plan, the mother's strengths were noted as "[she] loves her children; no domestic violence; no substance abuse." Needs were listed as "child needs met; develop relationship with children; maintain emotional stability; maintain stable housing; maintain employment." The mother's plan goals included developing and maintaining an appropriate relationship with her children, maintaining emotional stability, maintaining stable housing, and maintaining employment. The mother was also required to cooperate with the child support enforcement division. The mother never successfully completed her case plan, although the evidence shows at least some level of cooperation and effort in each area. The mother visited her children more than 60 times, which was more than 98 percent of the scheduled visitations. The mother attended ten sessions with a psychological counselor, as the Department recommended. The Department asked the mother to attend joint counseling with the children's father, and she appeared for the counseling session, although he did not. And although the Department maintains the mother is deficient in her parenting skills, she did complete a required course in parenting. The mother's satisfaction of her employment, housing, and child support goals was more problematic. She abandoned her apartment in October 1999 and moved in with her grandmother, who has never agreed to take in the mother's children. The mother also had difficulty securing permanent employment. She was employed at a fast food restaurant from August 1998 through May 1999, when she was fired. She started another job in June 1999 and was laid off after six weeks. She had a seasonal job at Honey Baked Ham around Thanksgiving of 1999. At the time of the hearing in May 2000, the mother was eight months pregnant [with G. B., born June 19,

2000,][2] and unemployed. The mother was unable to maintain her child support payments. However, she attended school as a part of an agreement with the child support enforcement division. In September 1999, the mother had an altercation with the children's father (who did not live with the mother at the time and is currently incarcerated) and was jailed for a day. It was after this incident that the Department sought to terminate the mother's parental rights. The caseworker testified that she filed the petition because there had been no change in the mother's situation since 1996, and because she failed to make further progress on her case plan.

(Punctuation omitted.) Id. at 860-861.

On this factual basis, this Court concluded that "[c]lear and convincing evidence [did] support the juvenile court's findings that (1) the children were deprived, (2) the deprivation was caused by lack of parental care and control, and (3) the deprivation was likely to continue." *In the Interest of D. F.*, supra at 861. Therefore, these findings cannot now be contested by J. R., as they are the law of the case.[3] *In the Interest of B. G.*, 242 Ga. App. 546 (530 SE2d 473) (2000).

While J. R. is correct that past deprivation alone cannot support a termination order, the juvenile court " ' "can consider a parent's past conduct in determining whether such conditions of deprivation are likely to continue." ' " *In the Interest of R. W.*, 248 Ga. App. 522, 524 (1) (546 SE2d 882) (2001), cited in *In the Interest of N. Q.*, 260 Ga. App. 118, 121 (578 SE2d 920) (2003).

Further, on appeal, this Court views the evidence in the light most favorable to the State, defers to the juvenile court's factfinding, and does not weigh the evidence or determine witness credibility. *In the Interest of C. M.*, 251 Ga. App. 374 (554 SE2d 510) (2001). Following the issuance on October 11, 2001, of *In the Interest of D. F.*, J. R. continued in her failure to comply with the case plan regarding establishing a parent/child relationship with her children, obtaining and maintaining independent suitable housing, obtaining and maintaining employment, and supporting her children, resulting in the Department's filing its second petition to terminate J. R.'s parental rights on February 20, 2002.

Viewing the evidence produced at the hearings conducted May

---

[2] J. R.'s parental rights to G. B. were not terminated, although he remains in the temporary custody of the Department.

[3] OCGA § 9-11-60 (h) provides that the law of the case rule is abolished, provided, however, that any ruling by the Supreme Court or the Court of Appeals in a case shall be binding on all subsequent proceedings in that case in the lower court, the Supreme Court, or the Court of Appeals.

22, 2002, and June 19, 2002, pursuant to the standard set out above, it was that Cleveland, a Carroll County DFACS adoption placement worker, had been involved with J. R. since April 2000, and had unsuccessfully sought family members with whom to place D. F., I. F., and A. F. These three children have been in DFACS's custody since May 20, 1998. The children were placed in a Madison County "foster to adopt" home where they had been for over a year as of May 2002, and all three children had bonded with that family.

D. F. and I. F. had been seeing Dr. Eason, a clinical psychologist with a specialty in child and family psychology. D. F. was first seen in July 2000, at which time Dr. Eason diagnosed her with attention deficit/hyperactive disorder (moderate to severe) (AD/HD) and oppositional defiant disorder (ODD). The symptoms of the latter disorder were that D. F. was noncompliant, argumentative, and given to temper tantrums. She had learned a way of dealing with the world that was manipulative and controlling through negative behaviors. According to Dr. Eason, children with AD/HD require more involved parenting than normal children and it is a constant challenge to deal with the behavioral manifestations of AD/HD. If a child also has ODD, the behaviors can be very difficult to deal with.

I. F., when first seen by Dr. Eason, was very anxious due to changes in her foster care situation. Initially, D. F. was placed in one foster home, and I. F. and A. F. were placed in another.

According to Dr. Eason, the Madison County foster parents had exhibited the talents and skill needed to deal with D. F.'s problems. When last seen by Dr. Eason, a week prior to the May hearing, both D. F. and I. F. exhibited marked improvement. D. F. no longer required medication for her AD/HD and her ODD behavior had improved. I. F. had become a delightful, very happy, and well-adjusted child. Dr. Eason also said that D. F.'s condition would require future medical treatment and possible psychological treatment throughout her childhood. In Dr. Eason's opinion, the children had not formed an attachment to J. R. because of the length of their separation, and removing the children from the Madison County placement would be harmful to them.

The Madison County foster care case manager testified that, based on weekly contact with D. F., I. F., and A. F. and their foster family, it was also her opinion that removing them from that setting would be harmful to them.

In November 1998, J. R. had been ordered to pay support for D. F., I. F., and A. F. In July 2000, that order was amended to require that she also pay support for G. B. In May 2001, J. R. was found in contempt for failing to pay support. In order to purge this contempt and keep her from going to jail, on May 22, 2001, J. R. paid $1,000, which she obtained from her grandmother. Although more payments

were due to keep her purged, none were made and she was in jail during the June 2002 hearing. As of May 2002, J. R. was in arrears $8,111.25. Although she argues that a portion of this accrued during the period following termination of her rights to D. F., I. F., and A. F. and its subsequent reversal, it is undisputed that her rights to G. B. were never terminated and she made no payments toward his support in 2002. Also, J. R. made no support payments for D. F., I. F., and A. F. even after *In the Interest of D. F.*, supra, reversed that termination order. J. R.'s only explanation for not supporting her children was that, during her brief periods of employment, she thought her employers would take the support out of her checks and they did not. Although there was no physical reason J. R. could not work and she understood that obtaining and maintaining employment were required, the only job she had had since the original termination was reversed was baby-sitting. The most she ever made from that was $200 every two weeks.

Despite the requirement of her case plan that she obtain and maintain independent housing,[4] J. R. continued to live with her uncle, Mr. Zachary. She moved from Carrollton to Stone Mountain in October 1999 with Zachary, and then to East Point when he moved there. Zachary did not testify, and there was no credible evidence introduced that he was willing to take the three children in his home. J. R. acknowledged that she had not tried to find housing of her own, as required by the case plan.

Although J. R. did finally complete a parenting course, she was unable to incorporate those skills into her interactions with her children. Caseworker Lewis oversaw J. R.'s visits with D. F., I. F., and A. F. She described the visits as extremely stressful and out of control. Eventually, the visits required the presence of two caseworkers and were removed from the playground because of J. R.'s inability to control and supervise the children. The interaction between mother and children was more "parallel play" than a parental relationship.

While, during the pendency of *In the Interest of D. F.*, supra, J. R. had been enrolled in school, she acknowledged at the June 2002 hearing that she had been out of school for over a year. Also, J. R. told Carroll County DFACS worker Lewis that she had a job, but when Lewis called the number given her by J. R. as her job, the employer denied that she did or ever had worked there.

The juvenile court's determination that parental misconduct or inability had been shown merited termination of J. R.'s parental

---

[4] This requirement was based on J. R.'s psychological evaluation. The psychologist opined she needed to be self-sufficient and self-supporting because she had a history of depending on others, including her relationship with the father of D. F., I. F., and A. F., which included domestic violence.

rights, and that termination was in the best interests of the children is supported by clear and convincing evidence.[5] *In the Interest of K. S.*, 258 Ga. App. 24, 27 (572 SE2d 710) (2002); *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000).

2. J. R. also contends that the trial court improperly limited her cross-examinations of caseworkers Cleveland and Lewis.

During his cross-examination of Lewis, counsel for J. R. tendered into evidence R-1, a copy of the February 11, 1999 Citizen Review Panel Findings and Recommendations. When the document was tendered, the court allowed it into evidence as a business record.

During the discussion of its admission, the following exchange occurred between the court and J. R.'s counsel:

> THE COURT: Again, I would — many of the panel reviews I would admit not for the opinion in them and allow for that but the fact that a record was kept —.
> [COUNSEL]: Okay.
> THE COURT: — on there and that's what I'm admitting it for, not to look in there and say — I will not look in there to see, well, what was their opinion on this, on that. I would not do that —.
> [COUNSEL]: Okay.
>
> . . .
>
> THE COURT: Now, let's get back to this. Are you still wanting it admitted for the purpose of just the record being kept?
> [COUNSEL]: Yes, Your Honor.

No objection to not being able to use the document for impeachment having been preserved, we will not consider it here. *In the Interest of A. A.*, 253 Ga. App. 858, 862 (2) (560 SE2d 763) (2002).

Regarding Cleveland, it is argued that J. R.'s cross-examination was improperly limited by the court's sustaining of the State's objection as irrelevant to questions about Cleveland's having anything to do with J. R.'s arrest. Counsel for J. R. stated his opinion that DFACS had done unfair and unprofessional things and wanted J. R. to come to court "in a jumpsuit[,] incarcerated" and that was the reason he was pursuing the issue. The court sustained the State's objection but stated he would not take into consideration what J. R. was wearing.

J. R. had acknowledged that she had been arrested for failure to pay child support and that she had not paid it. Any suspicions about the motives of any individual DFACS employee under these circum-

---

[5] The decision as to the children's futures must be based on more than positive promises that are contrary to negative past fact. *In the Interest of T. W.*, 255 Ga. App. 674, 677 (2) (566 SE2d 405) (2002).

stances would be speculative, and we find no abuse in the trial court's sustaining of the State's objection. *Neloms v. State*, 238 Ga. App. 11 (517 SE2d 537) (1999).

*Judgment affirmed. Barnes and Adams, JJ., concur.*

DECIDED MAY 6, 2003.

*Hamrick, Drummond & Miller, Kevin W. Drummond*, for appellant.

*Thurbert E. Baker, Attorney General, Dennis R. Dunn, Deputy Attorney General, William C. Joy, Senior Assistant Attorney General, Shalen S. Nelson, Laura W. Hyman, P. Brian Campbell, Assistant Attorneys General, Stephanie B. Hope, Doris C. Orleck*, for appellee.