A05A1505, A05A1506. In the Interest of I. M. G. et al., children (two cases).

(624 SE2d 236)

Adams, Judge.

The parents of I. M. G. and H. N. G. appeal the termination of their parental rights.

On appeal from an order of termination, this Court views the evidence in the light most favorable to the juvenile court's decision and determines whether any rational trier of fact could have found by clear and convincing evidence that the parents' right to custody should have been terminated. *In the Interest of K. N.*, 272 Ga. App. 45 (611 SE2d 713) (2005). In making that determination, we neither weigh the evidence nor assess the credibility of any witnesses, but instead defer to the juvenile court's factual findings. *In the Interest of J. G. J. P.*, 268 Ga. App. 614 (602 SE2d 320) (2004).

Viewed in that light, the evidence shows that the Department of Family and Children Services (DFACS) initially became involved with I. M. G. and H. N. G. in May 2001 after receiving a referral that the family home was filthy and cluttered. During the initial investigation, DFACS became aware that the mother and father slept with the children in one room where sexual toys and pornographic movies were kept. DFACS provided ongoing services to the family, including a safety plan that stated that the children's maternal grandmother was not to babysit the children.[1] In December 2002, the children's father was arrested for child molestation and indecent exposure in Cobb County in connection with a child other than I. M. G. and H. N. G. As a result of the husband's incarceration, the mother was unable to provide for the children and agreed to their placement with a family friend, whose home had been approved by DFACS.

Shortly thereafter, the children began recounting incidents of sexual abuse. H. N. G. stated that her mother and father had "poked her private parts." I. M. G. stated that her grandmother's boyfriend had touched her genitals when her grandmother was babysitting her. When DFACS personnel visited the mother's home to discuss these allegations, they observed that the home again was filthy and the mother conceded that she had violated the safety plan in allowing her mother to babysit. The mother denied, however, that she had ever molested the children. DFACS then referred the mother and children for psychosexual evaluations.

On January 10, 2003, the children came into DFACS' care as a result of the allegations of abuse, and the mother consented to DFACS

---

[1] The mother told authorities that she had been molested by her mother's boyfriend and two other male acquaintances of her mother.

receiving temporary custody. The mother was granted supervised visitation. On February 7, 2003, the children's father was convicted on the child molestation and public indecency charges in Cobb County, and was sentenced to serve 15 years.

On April 23, 2003, the juvenile court entered an order of adjudication/disposition finding that the children were deprived and continuing temporary custody with DFACS. The finding of deprivation was based upon the father's incarceration; the parents' unstable finances and unstable/unsanitary housing; the mother's psychological problems and their negative effect on her parenting; her failure to protect her children from exposure to child molesters; and their subsequent molestation. The deprivation order noted that the mother had filed for divorce since the father's incarceration and further noted the testimony of Dr. Erica Laing, a psychologist, stating that she had diagnosed the children as having been sexually abused and had found that they exhibited an adjustment disorder, with mixed anxiety and a depressed mood. The juvenile court also noted the recommendations of a second psychologist, Dr. William Moon, that the mother develop independent living skills, attend parenting classes and counseling and refrain from becoming involved with men. That order was not appealed.

The juvenile court later entered an order incorporating a reunification plan prepared by DFACS for the mother. Under the plan, the mother was to protect her children from sexual abuse; submit to a psychological evaluation at the Medlin Clinic; become psychologically and emotionally healthy by following Dr. Moon's recommendations, including counseling; maintain sufficient employment and housing; complete parenting classes and demonstrate the skills learned; provide 20 percent of her income as financial support for the children; and cooperate with DFACS, providing proof of her case plan compliance.

In September 2003, the juvenile court granted DFACS' motion to terminate the mother's visitation rights with the children. In support of this order, the court cited the testimony of Dr. Tammy Coots, a psychologist, that while in foster care, the children had been sexually acting out. The therapist concluded that this behavior may have resulted from the children's visits with their mother, which she said may have also contributed to the children's emotional problems. Within six weeks after the visitation stopped, the children's incidents of misbehavior decreased. Two months later, the mother married a man 37 years her senior[2] in contravention of Dr. Moon's advice that she refrain from becoming involved with males.

---

[2] The children's father is 28 years older than the mother.

On January 2, 2004, with therapist approval, the juvenile court allowed a supervised visitation between the mother and the children. The mother gave each child a doll. After the visit, both children reportedly exhibited inappropriate, sexual conduct toward the dolls. H. N. G. also experienced nightmares and resumed sexually acting out. I. M. G. decompensated emotionally. Further, following this visit, I. M. G. drew a picture of two naked people, which she labeled as her mother and father and which depicted the father as being sexually aroused. The juvenile court subsequently entered an order extending DFACS' temporary custody of the children. The court determined that while reunification services would continue, the permanency plan would be for adoption. The juvenile court also found that the mother had sexually harmed the children, although the extent of her actions could not be determined, and that both parents had allowed them to be sexually abused by others. Neither parent appealed this order.

On April 27, 2004, DFACS filed a petition to terminate the parents' parental rights. The mother testified at the hearing that she had remarried, and her children had never met her husband. She admitted, however, that it was not a good idea to get married while she was trying to reunify with her children. She also acknowledged that her marrying a stranger might make her children uncomfortable, but said that she would be willing to divorce her husband if that was the case. She further acknowledged that both she and her new husband were "scared" of her children, even though she loves them. She is scared that they might make additional allegations about her.

The mother stated that while she was growing up, her own mother was involved with a number of men, all but one of whom sexually abused her. The mother testified that one of these men was her ex-husband, the children's father, who abused her when she was fourteen years old. The mother testified that during her marriage to the father, he was arrested three times and that she accepted him back into her home each time he was released from jail. She testified that she never believed that the father had molested the children because all she got was "third hand information" about the incidents. The mother later stated that she did not know if they had been molested, but acknowledged that their allegations were more credible because the children claimed to have been molested by the same people who had molested her. She also admitted that it had been a mistake to leave the children with her mother.

While the mother denied that she had ever molested her children, she admitted that she had exposed them to adult magazines and sexual toys because she thought that was "normal." The mother also stated that she and the children's father shared a bedroom with the children, and I. M. G. would sleep in their bed, but the mother

denied that they had ever engaged in any inappropriate behavior with or in front of the children. The mother eventually stated that she felt that her children were molested, but she does not know exactly what happened because she has not talked to them about it.

Gail McDaniel, the supervisor of the foster care unit for Bartow County DFACS, testified that the children had remained in the care of the mother's family friend and her husband since first coming into DFACS custody. She testified that the children seemed very comfortable with their foster mother and appeared to have bonded with her. She stated that DFACS intended to leave the children in this placement, and that it was possibly a preadoptive situation. McDaniel believed that it would be in the children's best interests to remain with their foster parents.

Dr. Coots, the children's psychologist, testified that she had treated the children for two and one-half years. When she first saw the children in March 2003, they exhibited symptoms such as bed wetting, anxiety, nervousness, sexual acting out, nightmares, sometimes anger and aggression in general. But in May 2004, Dr. Coots reduced the frequency of the children's sessions because they had made good progress. They had become stable both emotionally and behaviorally.

Dr. Coots believed that children who had been sexually abused have extra supervisory needs. The doctor observed that I. M. G. and H. N. G. had a good relationship with their foster mother, were excited to talk with her after their sessions, and had indicated that they wanted to stay in their foster home. She believed that they would be harmed if removed from their foster home. Dr. Coots stated that the children are concerned about being touched again.

Gail Everett, a DFACS foster care worker, described the relationship between the children and their foster parents as "extremely close." Everett testified that the father had been incarcerated since the children were in foster care and made no attempts to contact her regarding their care. No DFACS services could be completed due to his incarceration.

### Case No. A05A1505

1. In addition to this evidence, the state presented the testimony of Randi Stevens, a psychotherapist and licensed family and marriage therapist at the Medlin Clinic, who testified that she had been treating the mother for a year following DFACS' referral. But when the state's attorney asked Stevens whether the mother had not been truthful with the therapist, the mother's attorney objected asserting

a therapist/client privilege. The mother asserts in this appeal that the juvenile court erred in overruling this objection and in allowing Stevens to testify.

The Supreme Court of Georgia recently clarified the scope of the psychotherapist-patient[3] privilege in the context of court-ordered evaluations, counseling and treatment in *State v. Herendeen*, 279 Ga. 323 (613 SE2d 647) (2005). Under OCGA § 24-9-21 communications between a psychotherapist and patient are excluded from evidence on grounds of public policy. See also OCGA § 43-39-16. As the Supreme Court acknowledged:

> As far as the individual patient's private interest is concerned, confidentiality is a sine qua non for successful psychotherapeutic treatment since a psychotherapist's ability to help a patient is completely dependent upon the patient's willingness and ability to talk freely, and assurances of confidentiality and privilege foster the psychotherapist's ability to function.

(Citations omitted.) *Herendeen*, 279 Ga. at 325.

But the precondition for invoking such a privilege is that "the requisite relationship of (mental health provider) and patient must have existed, to the extent that treatment was given or contemplated." (Citation and punctuation omitted.) *Herendeen*, 279 Ga. at 326. The required relationship "does not exist when the mental health provider is appointed by the court to conduct a preliminary examination to evaluate a person's mental state because, in such a situation, mental health treatment is not given or contemplated." (Citations omitted.) Id. Thus, no privilege exists when a juvenile court orders a participant in a termination of parental rights proceeding to undergo a mental evaluation because such an order does not provide for or contemplate mental health treatment. Id. See also OCGA § 15-11-100. The crucial issue, therefore, is not whether the interaction between the mental health worker and the patient was voluntary or involuntary, but rather whether it involved or contemplated treatment. Id. at 327. See also *Lucas v. State*, 274 Ga. 640, 645 (8) (555 SE2d 440) (2001).

Here, the juvenile court found that the mother's relationship with Stevens involved treatment to deal with her past sexual abuse

---

[3] The use of the term "psychotherapist-patient" privilege in this opinion is intended to encompass privileged communications between a patient and the mental health professionals listed in the statute, including a licensed marriage and family therapist such as Stevens. OCGA § 24-9-21 (5)-(8).

for the purpose of seeking reunification with her children. Nevertheless, the court allowed Stevens' testimony, including a response to the question of whether she had been untruthful to her therapist. The termination order clarified that the juvenile court admitted the evidence based upon a determination that the mother did not voluntarily seek treatment and thus "could have had no expectation that her treatment would not be subject to Court scrutiny."

Because we agree with the finding that Stevens was providing mental health treatment to the mother, we find that the juvenile court erred in admitting Stevens' testimony regarding her communications with the mother. The juvenile court ordered the mother to submit to a psychological evaluation from the Medlin Clinic and also to follow Dr. Moon's recommendation to seek counseling. Although Stevens worked for the Medlin Clinic, it is clear that her role was not confined to a mental health evaluation. The therapist testified that she had been seeing the mother for two and one-half years and the mother testified that she had not missed a counseling session. She believed that this counseling had been beneficial and had helped her, for example, to understand that exposing her children to sexually explicit items was not appropriate. Thus, it is apparent that Stevens was providing treatment to the mother and that the requisite therapist-patient relationship existed. And even though the mother did not seek this treatment voluntarily, the psychotherapist-patient privilege applied. *Herendeen*, 279 Ga. at 327.

The juvenile court noted in its termination order, however, that even if its admission of this evidence was error, the error did not affect the outcome of the case because the mother "had a psychological impairment which negatively affected her parenting." Despite this disclaimer, the termination order goes on to cite Stevens' testimony in detail in support of the court's decision to terminate the mother's parental rights. Accordingly, we cannot conclude that the admission of such privileged information would be harmless in this case.

Nevertheless, the psychotherapist-patient privilege is subject to waiver and an issue exists as to whether the mother has waived her privilege here. Waiver requires "the voluntary relinquishment of a known right and may be established by express statements or implied by conduct." (Footnote omitted.) *Kennestone Hosp. v. Hopson*, 273 Ga. 145, 148 (538 SE2d 742) (2000). And given the importance of the psychotherapist-patient privilege, our Supreme Court has held that waiver requires more than silence or failure to act in response to a third-party request for privileged matter. Id. at 149.

Here, Stevens testified that the mother signed a number of releases allowing the therapist to transmit information to Bartow County DFACS; her husband; her attorney; a separate treatment center; a polygraph facility; and Dr. Moon. In addition, the mother

signed an internal release allowing the sharing of information within the Medlin Clinic. The juvenile court did not address the issue of waiver and the releases were not introduced into evidence. Thus, we cannot determine whether the mother has waived the privilege arising out of her relationship with Stevens. Accordingly, we reverse the termination of the mother's parental rights and remand to the juvenile court to consider the issue of waiver.

2. Given our holding above, we do not address the mother's remaining enumeration of error arguing that the termination of her parental rights was against the weight of the evidence.

### Case No. A05A1506

3. The children's father also contends that the evidence in the case was not sufficient to support the termination of his parental rights. We disagree.

Courts apply a two-step analysis for determining whether a parent's right to custody should be terminated:

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. [Second,] [i]f these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Footnotes omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000). See also OCGA § 15-11-94 (b) (4) (A).

(a) We find that there was clear and convincing evidence of the father's parental misconduct or inability, based upon the four statutory factors. There is no issue in this case as to whether the children are deprived as the father is bound by the trial court's prior finding of deprivation, which he never appealed. *In the Interest of M. E. M.*, 272 Ga. App. 451, 453 (612 SE2d 612) (2005). Moreover, the evidence was sufficient to support a finding that the father's lack of proper parental care or control caused the children's deprivation.

In determining whether the children were without proper parental care and control, the juvenile court was authorized to consider

the father's felony conviction[4] and 15-year sentence of imprisonment and whether these factors have had a demonstrable negative effect on the quality of the parent-child relationship. OCGA § 15-11-94 (b). See also *In the Interest of S. R. B.*, 270 Ga. App. 466, 470 (4) (606 SE2d 655) (2004). Although imprisonment alone does not always compel a termination of parental rights, it will support such a ruling when adequate aggravating circumstances are shown to exist. *In the Interest of D. M. W.*, 266 Ga. App. 456, 458 (2) (597 SE2d 531) (2004). One of these aggravating factors is whether the parent has a criminal history of repetitive incarcerations for criminal offenses. *In the Interest of D. T. C.*, 248 Ga. App. 788, 791 (2) (b) (548 SE2d 11) (2001). Here, in addition to the evidence of the father's Cobb County conviction, the mother testified that the father had been jailed at least three times during their five-year marriage. Another factor to be considered is "whether the incarcerated parent has made an effort to communicate with the child and, despite imprisonment, maintain a parental bond in a meaningful, supportive and parental manner." (Punctuation and footnote omitted.) *In the Interest of D. M. W.*, 266 Ga. App. at 459 (2). The record indicates no evidence of any parental bond between the children and their father or of any attempts by the father to concern himself with the children's financial, physical or emotional care. DFACS employee Everett testified that the father had made no attempt to contact her about the children.

Moreover, the court could certainly consider the fact that the father's conviction involved the molestation of another child, as well as the mother's testimony that he had molested her when she was 14 years old. *In the Interest of S. R. B.*, 270 Ga. App. at 470 (4). Other evidence, such as I. M. G.'s statement that her father had "poked her privates," her drawing of a sexually aroused male figure labeled as her father and the presence of sex toys and adult magazines in the family bedroom, presented additional factors to support a finding of aggravating circumstances.

We also find that clear and convincing evidence supported the trial court's findings on the remaining two factors determining that the pattern of deprivation was likely to continue and that such deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children. OCGA § 15-11-94 (b) (4) (A) (iv). A juvenile court may consider evidence of past actions in making such determinations. *In the Interest of C. R. G.*, 272 Ga. App. 161, 164-165

---

[4] The fact that the father has filed a motion for new trial in his criminal action does not affect this analysis. See *In the Interest of D. L.*, 268 Ga. App. 360, 364 (3) (601 SE2d 714) (2004) (termination proper where father charged with murder could not tell when his trial would be held, could not predict the outcome and could not give the court a time frame when he might be able to care for the children).

(611 SE2d 784) (2005); *In the Interest of A. M.*, 259 Ga. App. 537, 542 (578 SE2d 226) (2003). And this Court has held that "past conduct during periods of freedom is also a good harbinger of whether the deprivation will likely continue after incarceration." (Citation and punctuation omitted.) *In the Interest of B. S.*, 265 Ga. App. 795, 798 (595 SE2d 607) (2004). The evidence clearly showed that the children had suffered emotional and sexual harm during the period that their father was responsible for their care, which caused them emotional distress and behavioral problems. But while in the stable environment of their foster home, they had continued to improve.

(b) There was also clear and convincing evidence to support a finding that termination of the father's parental rights would be in the best interests of the children. The factors addressed above, "which established the father's inability to properly care for [the children], also prove that the termination of his parental rights is in the [children's] best interest[s]." *In the Interest of C. B.*, 258 Ga. App. 143, 147 (1) (574 SE2d 339) (2002). The juvenile court also "may consider the children's need for a stable home environment and the detrimental effects of prolonged foster care. Children need permanence of home and emotional stability or they are likely to suffer serious emotional problems." (Punctuation and footnote omitted.) *In the Interest of K. N. C.*, 264 Ga. App. 475, 482 (4) (b) (590 SE2d 792) (2003). See also *In the Interest of P. A. T. L.*, 264 Ga. App. 901, 904 (2) (592 SE2d 536) (2003). The children had been in the same foster home for over two years and had bonded with their foster parents. The children were continuing to improve and to receive the support and stability they required. DFACS workers also believed that the potential existed for the foster home to become a preadoptive placement. In contrast, there was no indication when, if ever, the father would be able to provide an adequate, stable environment for his children.

Accordingly, we affirm the juvenile court's determination that the parental rights of the father should be terminated.

*Judgment reversed and case remanded in Case No. A05A1505. Judgment affirmed in Case No. A05A1506. Smith, P. J., and Ellington, J., concur.*

DECIDED DECEMBER 1, 2005.

*Brunt & Hood, Thomas N. Brunt, Joshua D. Earwood*, for appellants.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Neel & Smith, Barry S. Haney*, for appellee.