*Judgment affirmed. Blackburn, P. J., and Ruffin, J., concur.*

DECIDED JANUARY 31, 2008 —
RECONSIDERATION DISMISSED FEBRUARY 28, 2008 

*Kenneth W. Sheppard*, for appellant.
*Steven Askew, District Attorney, Charles D. Howard, Assistant District Attorney*, for appellee.

A07A2355. IN THE INTEREST OF P. K. V. G. et al., children.
(658 SE2d 416)

BARNES, Chief Judge.

The juvenile court terminated the mother's parental rights to her two children, P. K. V. G. and L. K. V. E.[1] The mother moved for a new trial, but her motion was denied. In her sole enumeration of error on appeal, the mother contends that the juvenile court erred in finding that the termination of her parental rights was in the best interests of the children. As this contention lacks merit, we affirm.

> On appeal, we must determine whether, after reviewing the evidence in a light most favorable to the lower court's judgments, any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. This Court neither weighs evidence nor determines the credibility of witnesses; rather, we defer to the trial court's fact-finding and affirm unless the appellate standard is not met.

(Citation and footnote omitted.) *In the Interest of C. R. G.*, 272 Ga. App. 161, 161-162 (611 SE2d 784) (2005).

So viewed, the evidence demonstrates that three-year-old P. K. V. G. and six-year-old L. K. V. E. were removed from their home on July 18, 2003 after the mother was incarcerated and relatives could not care for them. Subsequently, the Department of Family and Children

---

[1] Neither of the children's putative fathers are parties to this appeal.

Services (DFACS) counselor assigned to the case conducted a first placement/best placement assessment of the children and, after noting the mother's multiple incarcerations, L. K. V. E.'s severe academic and behavioral problems, P. K. V. G.'s serious developmental delays, and the children's almost immediate improvement in therapeutic foster care, recommended immediately terminating the mother's parental rights to the children. Both children suffered from fetal alcohol syndrome accompanied by gross social, emotional and physical underdevelopment. P. K. V. G. has cerebral palsy, and then seven-year-old L. K. V. E., who had witnessed his grandfather kill his grandmother then commit suicide, exhibited extreme attention deficit hyperactivity disorder symptoms, extreme frontal lobe deficits, and difficulty in self-control.

From January 2001 until April 2005, the mother was arrested at least six times for charges ranging from aggravated assault, auto theft, and disorderly conduct. At the time of the termination hearing, April 20, 2005, the mother was incarcerated, and had been in and out of jail for almost 34 of the past 36 months. The mother expected to be released in July 2005, but admitted that she had not been sentenced for her most recent charges of theft of a motor vehicle and interference with government property, and that the new sentence could affect her release date. The mother had a very violent relationship with P. K. V. G.'s father which was witnessed by the children. She admitted that on another occasion she had stabbed a former boyfriend five times at her home, although the children were not present during the altercation. The mother acknowledged that because of her incarcerations she had spent only three months with P. K. V. G. and L. K. V. E. in the past three years. She and her four children had lived with an aunt until her arrest. The aunt kept the mother's two younger children, but told DFACS that she was unable to care for P. K. V. G. and L. K. V. E. The mother planned to return to the aunt's house once she was released.

A case plan was prepared for the mother while she was incarcerated that required, among other things, the mother to obtain and maintain stable housing and employment, submit to random drug screenings, remain alcohol and drug free for six months, arrange for child care services, and demonstrate that she could care for the children's special needs. The caseworker testified that it would take the mother from six months to a year to complete the case plan after her release from prison. The mother testified that she had completed the first stage of her parenting class but had four more stages to complete. She expected to complete her case plan in "six months to a year" after her release from jail. The mother further testified that she had held a steady job for as long as two years, but had not been able to in the last few years because of her incarcerations. She said that she was familiar with her children's special needs but did not know

that P. K. V. G. had cerebral palsy although she had concerns that the child was "not doing other things that babies her age were doing."

The psychologist who evaluated the mother testified that she suffered from major depressive disorder, alcohol abuse, borderline intellectual functioning, and anti-social personality disorder. The doctor further testified that the mother needs to demonstrate that she "can operate in the real world and not in jail," and "show that she can hold a job for a continuous period of time and make some money and have a stable roof over her head and have some clothes and some food on the table . . . but also stay away from alcohol and stay out of jail and that hasn't happened." He noted that the mother's anti-social, oppositional defiant-type behavior started in her teen years, as reflected by her first incarceration in juvenile detention when she was 15, and the continuing incarcerations over the years. The doctor testified that because the mother is "borderline functioning," the children's special needs would be an added consideration in her ability to parent effectively. He opined that the mother had not "been able to meet her own needs throughout her life span," and "hasn't shown through her past behavior, which is absolutely the best predictor of future behavior, that she's capable of handling anything for herself or her children."

Before a juvenile court may terminate parental rights, the court must first find clear and convincing evidence of parental misconduct or inability. *In the Interest of K. M.*, 284 Ga. App. 442, 444 (644 SE2d 193) (2007). Such misconduct or inability is shown through evidence that: "(1) the children are deprived; (2) the cause of deprivation is lack of parental care or control; (3) the cause of deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the children." (Punctuation and footnote omitted.) Id. See also OCGA § 15-11-94 (b) (4) (A). "If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home." (Footnote omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000).

The mother challenges the juvenile court's determination that the termination was in the best interests of the children. She argues that the evidence shows that she has a bond with her children, is capable of supporting them when she is released from prison, and has significantly complied with her case plan. We do not agree.

The children had been in foster care for twenty-two months at the time of the termination hearing, and would likely continue in foster care for, in the best case scenario, nine more months — three months until the mother's release from prison and another six months for her

to complete her case plan. That time could be extended indefinitely if the mother is sentenced to additional time for her most recent criminal charges or if it takes her longer to complete her case plan, or a combination of the two.

P. K. V. G. and L. K. V. E. have severe special needs and need highly trained care to address their needs. The mother had been unable to meet those needs in the past and had demonstrated an inability to meet her own needs as well. Both children have shown improvement in the therapeutic foster home where they are placed. P. K. V. G., who is severely developmentally delayed, has added new words to her vocabulary and improved her walking skills. L. K. V. E. does not have as frequent outbursts and is "able to verbalize his feelings more." The foster parents would like to adopt the children, and as DFACS notes in its brief, the mother said that if the children were adopted she would want them placed with their present foster parents.

Considering the children's needs, including the need for a secure and stable home, and their physical, mental, emotional, and moral condition, see OCGA § 15-11-94 (a),

> the juvenile court was authorized to infer from the evidence of past conduct that the improvements in the mother's situation were not sufficient to justify maintaining [P. K. V. G. and L. K. V. E.] in foster care limbo in hopes that the mother could achieve the needed parenting skills and provide an adequate home for [the children].

(Citation and punctuation omitted.) *In the Interest of B. J. F.*, 276 Ga. App. 437, 442 (1) (c) (623 SE2d 547) (2005).

Considering the foregoing, there was sufficient evidence to support the juvenile court's determination that termination of the mother's parental rights was in the children's best interests.

*Judgment affirmed. Smith, P. J., and Miller, J., concur.*

DECIDED FEBRUARY 28, 2008.

*Cassandra M. Ford*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Kelli C. Rutherford*, for appellee.