A05A0604. IN THE INTEREST OF T. B., a child.
(616 SE2d 896)

ADAMS, Judge.

The father of T. B. appeals the termination of his parental rights.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001). "We do not weigh the evidence and must defer to the trial judge as the factfinder." (Citation and punctuation omitted.) *In the Interest of C. F.*, 251 Ga. App. 708 (555 SE2d 81) (2001).

The record shows that T. B. and her siblings were first removed from their mother's care in March 1997. T. B. was five and her putative father,[1] appellant herein, was incarcerated. The children were first placed in foster care but then placed with their paternal grandparents. Both the father and mother agreed at that time to relinquish their parental rights to T. B. and her siblings. By February 2001, the grandmother, who had Alzheimer's disease, was unable to provide the proper care for the children, and they were removed from the home. A deprivation action was filed in Douglas County. Although the father was again incarcerated, it was recommended that a case plan be made for him when he was released from jail.

Another deprivation hearing was held on May 21, 2001. The father, who had been released from jail, attended that hearing and

---

[12] See *McBride v. State*, 213 Ga. App. 857, 860 (7) (446 SE2d 193) (1994).
[1] At that time, the father had not yet taken steps to legitimate T. B.

stipulated that he was incarcerated at the time of the previous hearing and that the children were deprived at the time they came into the custody of the Department of Family and Children Services (DFCS). The juvenile court entered an order following the hearing adjudicating the children deprived and placing the children in the custody of DFCS; the father did not appeal that order.

The father entered into a reunification case plan, and a review hearing was conducted on the plan on August 20, 2001. The father was present at the hearing, as was T. B.'s foster mother. The foster mother testified concerning T. B.'s continuing behavioral problems and testified that these problems worsened after visitation with the father. However, testimony was also presented concerning the significant progress the father was making on the reunification plan. Based on this testimony, the juvenile court ordered increased visitation with the father but also strongly cautioned the father that continued progress toward reunification depended on (1) no further criminal conduct or conduct resulting in violation of his probation; (2) no substance abuse; and (3) no family violence.

Another hearing was held on October 10, 2001 after DFCS filed a motion to restrict the father's visitation because he used corporal punishment to discipline T. B. T. B. was examined at the hospital following this incident, and photographs were introduced showing severe bruising on T. B.'s buttocks, chest, back, legs and arms. Following the hearing, the juvenile court found that the father injured the child but that he did not intend to harm her. The court also found the father had failed to give T. B. her medication as scheduled. The court allowed the father to continue unsupervised visitation with T. B.'s siblings but required him to refrain from using physical discipline. The court further ordered that visitation with T. B. be supervised.

A review hearing was conducted on November 16, 2001. The court found the father had completed his case plan, and T. B.'s siblings were returned to his custody. The court ordered that T. B. remain in the custody of DFCS and that she should receive psychotherapy to address issues of abuse and to help her move toward reuniting with her family.

Another review hearing was held on January 18, 2002. Evidence was presented that T. B.'s siblings had missed numerous days of school since they had been returned to the father's custody. The guardian ad litem reported that T. B. was doing well in therapeutic foster care and that she did not wish to be returned to her father. The guardian recommended nonreunification as the permanency plan for T. B.

The juvenile court conducted a hearing on DFCS's motion to extend custody of T. B. on February 1, 2002. The father was not

present at the hearing but was represented by counsel. Following the hearing, the court entered an order finding that the father stipulated through his attorney that T. B. was deprived. The court noted that T. B. suffers from severe behavioral problems and extended DFCS's custody of T. B. another 12 months. The court approved reunification with the father as the permanency plan. This order was not appealed.

The court conducted another review hearing on May 17, 2002. Evidence was presented that T. B. was doing much better in school and that her behavior had improved "tremendously." Evidence was also presented that the father had completed his case plan, but that he had only visited once or twice with T. B. in the last seven months. The guardian ad litem recommended that T. B.'s visitation with her father be increased, but that the visits initially should be of short duration progressing toward longer, overnight visits. The guardian also recommended that T. B. continue therapy through the summer. The court ordered expanded visitation with the father, approved reunification as the goal and maintained legal custody of T. B. with DFCS. The trial court also indicated at the hearing that it would grant the father's petition to legitimate T. B. and her siblings.

The court conducted another hearing in August 2002. The father had been arrested on July 22, 2002, for theft by receiving stolen property and was not present. The court entered an order finding that T. B. could not be placed with the father due to his incarceration. That order was not appealed.

DFCS filed a new deprivation complaint on February 4, 2003. Following that hearing, the juvenile court entered an order finding the child to be deprived, that the father could not meet the needs of the child due to his incarceration, and that the mother had abandoned the child. At a subsequent deprivation hearing, the court noted that the father was incarcerated with a maximum release date of July 21, 2007, and a possible release date in 2005.

On September 5, 2003, DFCS filed a petition to terminate the parental rights of both the mother and father. The mother voluntarily surrendered her parental rights and she is not a party to this appeal.

A hearing was held on the petition to terminate the father's parental rights on January 21, 2004. The father testified that he had been incarcerated since July 2002, and that he had been convicted of violating his probation and theft by receiving a stolen vehicle. He had not seen T. B. during that time. The father also testified that he had been convicted of three or four felonies, going back to 1987, and that he had been incarcerated on and off since that time. He acknowledged that a juvenile was involved with him in the most recent crime for which he was arrested. According to the father, he would be eligible for parole in March 2004, and he would be paroled to his mother and father upon his release. He admitted that he did not have stable

housing due to his current incarceration, but testified that he would not have a problem getting a job or securing housing upon his release. He also acknowledged that he had not paid child support for T. B., although he disputed that he had been ordered to pay child support or that it was part of his case plan.

The father agreed that T. B. had significant emotional issues, that she needed stability in her living arrangements, and that T. B. had formed a bond with the foster mother. He had never been involved in T. B.'s counseling sessions, but testified he had been advised not to. He also had not visited with T. B.'s teachers or the school since T. B. had been in the custody of DFCS. He testified that he had written T. B. a few times from prison, but that he did not have her telephone number when he was arrested so he had not been able to call her.

The father testified that he was taking classes while in prison to help him make better decisions. He acknowledged that he was asking for another chance to regain custody, and that he wanted the court to leave T. B. in foster care until he was stable enough to regain custody.

T. B.'s foster mother also testified. The foster mother testified that T. B. had been in numerous foster homes before she came to live with her and her husband, and that she was "basically a child out of control," with numerous behavioral problems both at home and at school. While in her care, T. B. had been diagnosed with attention deficit hyperactivity disorder and learning disabilities, and had been enrolled in therapeutic programs and special education classes and placed on medications to help her deal with her behavioral issues. The foster mother met with T. B.'s teachers frequently, and tried to get her help with her reading skills to improve her academics. She testified she provided T. B. with structure that helped T. B. with both her behavioral problems and academic issues.

The foster mother also testified that T. B.'s father had missed some visits and phone calls with T. B. prior to his recent incarceration, and that T. B. was hurt when her father failed to maintain contact. She also testified that T. B.'s attitude was bad when she returned from visits with her father, and that T. B. had issues with authority from the lack of structure early in her life. Additionally, she testified that T. B. came home with severe head lice after her last visit with her father.

The foster mother also testified that T. B. was "totally devastated" by her father's most recent incarceration and that she was still on an emotional roller coaster, at first angry and then crying. T. B.'s medications had to be adjusted in an attempt to help her deal with this. She recognized that T. B. loves her father and testified that although she and T. B. were now very close and that she wanted to adopt T. B., she would make efforts to allow her to have contact with her father.

T. B.'s therapist also testified. T. B. was in intensive therapy for approximately six months and attended sessions every weekday for three hours. Her therapist testified that her recommendation was that T. B. continue to receive a "somewhat intensive level of treatment," augmented by some "family work" for a minimum of another six months.

The DFCS supervisor over T. B.'s case also testified. Although she agreed that T. B. had a bond with her father, and that they were in a transition period with the goal of T. B. being returned to his custody at the time he was incarcerated, she also testified that he was not totally compliant with his case plan, and that there were inconsistencies in maintaining visitation and contact. She testified that he violated the case plan by once again being incarcerated, and that he had been admonished that if he violated his probation or was again incarcerated, termination proceedings would likely be instituted. The guardian ad litem also testified and recommended the father's parental rights be terminated. She testified about his inability to provide stability for T. B., which he acknowledged she needed, as well as the fact that he had been repeatedly incarcerated and failed to comply with the case plan in all aspects.

In determining whether to terminate parental rights, courts apply a two-step analysis:

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Citation omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000). See also OCGA § 15-11-94 (b) (4) (A).

In this case, the father challenges the juvenile court's finding as to the fourth factor of OCGA § 15-11-94 (b) (4) (A) and the court's finding that termination was in the best interest of the child. Specifically, as to the fourth factor, the father argues that there was insufficient evidence to support the finding that the continued deprivation of the child will cause serious physical, mental, emotional and moral harm to the child. The father seems to suggest that the

gains the child has made in controlling her behavior and making academic progress in school once she was placed in therapeutic foster care precludes this finding. The father also argues that the juvenile court failed to include explicit factual findings supporting its conclusion as to this factor in the termination order. Lastly, the father argues that there is no evidence that the child would be seriously affected by a continuing relationship.

Contrary to the father's arguments, the crux of this case is that T. B.'s emotional and mental health have been directly damaged by the father's demonstrated inability to forego criminal activity and stay out of prison so that he can provide a stable home for his child. This has had devastating consequences for this child. As the juvenile court noted, this is aptly demonstrated by T. B.'s out of control conduct until she was placed in therapeutic foster care. We fail to see how the fact that the child made significant improvements after she was placed in a structured environment, received intensive therapy and was placed on medications shows that continued deprivation would not cause further serious harm to the child.

Moreover, the foster mother's testimony that the father's most recent incarceration had a devastating effect on the child shows that despite the gains the child made, the father's inability to remain a stable and positive force in the child's life continues to have serious consequences. "Although incarceration alone need not always compel the termination of parental rights, it can support such a ruling when sufficient aggravating circumstances are present. A history of incarcerations for repeated offenses constitutes an aggravating circumstance that may be considered in support of the termination of parental rights." (Citation and punctuation omitted.) *In the Interest of M. D. F.*, 270 Ga. App. 460, 465 (606 SE2d 658) (2004). And it is without dispute that T. B. must have structure in her environment in order to have continued success dealing with her behavioral and learning issues, and that a lack of structure, even for the short periods of time when she was visiting with her father, had a noticeable negative effect on her behavior. Courts are clearly authorized to consider the special needs of the child and the parent's inability to provide for those needs. See *In the Interest of J. C. J.*, 207 Ga. App. 599, 602 (428 SE2d 643) (1993). The evidence was sufficient to support this element of the juvenile court's findings.

The evidence presented at the hearing and discussed above also supported the juvenile court's conclusion that terminating the father's parental rights was in the best interest of the child. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. [Cit.]" *In the Interest of D. L.*, 268 Ga. App. 360, 360-361 (601 SE2d 714) (2004).

Moreover, the evidence in this case demonstrated that because of the child's behavioral issues and learning disabilities, her needs could only be met by ensuring that she continued to live in a very stable and highly structured environment, which her father could not presently and had not ever been able to consistently provide her. See also OCGA § 15-11-94 (a) (court may consider child's need for a secure and stable home). The foster mother also testified about the bond between her and the child, and her desire to adopt the child and provide her with the stability and structure that she needs. Based on our review of the record, we conclude that there was clear and convincing evidence to support the juvenile court's finding that termination of the father's parental rights was in the best interest of the child.

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED JUNE 30, 2005.

*Sonya Chachere-Compton*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, T. Michael Flinn*, for appellee.