A05A1132. IN THE INTEREST OF M. W. et al., children.
(622 SE2d 68)

ADAMS, Judge.

The father of M. W. and D. W. appeals the termination of his parental rights. He challenges the sufficiency of the evidence and he contends that termination of his parental rights is not in the best interests of the children.

On appeal, we review the evidence in the light most favorable to the juvenile court's order. See *In the Interest of D. W.*, 235 Ga. App. 281 (509 SE2d 345) (1998). In conducting our review, we do not weigh the evidence or resolve credibility disputes but defer to the juvenile court's factual findings. See *In the Interest of D. F.*, 255 Ga. App. 153 (564 SE2d 767) (2002).

Viewed in this manner, the record shows that the Peach County Department of Family and Children Services (DFACS) first became involved in the lives of M. W. and D. W. in September 2001 when

---

DFACS took them into state custody along with their half-sibling, J. W.[1] At the time that DFACS intervened, the father who is mentally challenged, was caring for the three children notwithstanding the fact that D. W. and J. W. are severely handicapped.[2] D. W., who suffers from a seizure disorder and cerebral palsy, is confined to a wheelchair. After intervening, DFACS remained actively involved with the father and his family.

On January 30, 2003, hospital personnel contacted DFACS after paramedics expressed concern to authorities about the cleanliness of the home and the apparent neglect of D. W.'s soiled diaper. D. W. required emergency treatment for dehydration and a high fever. When DFACS learned that the family was about to be evicted from their home, DFACS tried without success to place D. W. in the care of relatives. As a result, DFACS placed D. W. in therapeutic foster care on January 30, 2003. After that placement, the father had little contact with D. W.

After an adjudicatory hearing, the juvenile court found D. W. deprived due to medical neglect, neglect/inadequate housing, the parents' mental/physical impairment and the child's cerebral palsy and special medical needs. The father did not appeal the deprivation order and the subsequent deprivation order entered in March 2003 again found D. W. deprived.

On September 30, 2003, the family was evicted from its home. In October 2003, Dr. C. Curtis Holmes, a psychologist, evaluated the father and determined that the father's cognitive deficits limited his parenting skills. Dr. Holmes diagnosed the father as being mildly mentally retarded and having an adjustment disorder with anxiety and depressed mood. In the professional opinion of Dr. Holmes, it was unlikely, even with intensive parental education, that the father possessed the capacity to be solely responsible for a child.

As part of a safety plan, M. W. was placed in an uncle's home where she was subsequently subjected to physical and sexual abuse. On January 29, 2004, M. W.'s school contacted DFACS about several marks and bruises on the child. An examining physician determined that the marks and bruises on M. W.'s back and thighs were consistent with sexual abuse. The perpetrator was never identified and M. W. was placed in foster care. After a hearing, the juvenile court entered a finding of deprivation as to M. W. and found her father was

---

[1] The father unsuccessfully appealed a deprivation order relating to J. W. in *In the Interest of J. W.*, 271 Ga. App. 518 (610 SE2d 144) (2005).

[2] J. W., who is not a part of this appeal, also has cerebral palsy and other special needs.

not mentally capable of caring for her. DFACS developed a reunification plan in February 2004 requiring the father to maintain a safe and clean home, maintain regular contact with M. W., and cooperate with DFACS.

While juvenile court proceedings relating to M. W. were pending, D. W. again came into emergency care and DFACS filed another deprivation petition on D. W.'s behalf. Following an adjudicatory hearing on February 19, 2004, the juvenile court found D. W. deprived due to his mother's abandonment and the mental and psychological limitations of both parents. Again, the father did not appeal the deprivation order.

On July 1, 2004, DFACS sought court approval for not reuniting M. W. and D. W. with their parents. An internal report indicated that M. W. did not appear to have any attachment to her father and recognized him only by his first name. The report noted that M. W. had adjusted well to her foster parents whom she called "mama and daddy." Another report observed that D. W. displayed little emotion but conceded that D. W.'s response could have been attributable to the child's medical condition.

On August 26, 2004, DFACS filed a petition to terminate the father's parental rights to both M. W. and D. W. At the termination proceeding, Yolanda Parker, the case manager, described DFACS's efforts to obtain aid from the Community Partnerships for Protecting Children to help the father maintain a clean home. Parker testified that no relatives were willing to serve as placements for the children or to help the father to keep the home clean. Nor did any relatives express any desire to provide assistance in caring for the children. Parker reported that DFACS had worked with United Cerebral Palsy to obtain help. Parker testified that DFACS considered the home unsafe for the children due to over-spilling trash cans, the presence of rats and roaches, and the consistently unclean bathroom and kitchen areas.

Parker also testified that after one particular visit with her father, M. W. had bruises on her thighs. Upon inquiry, M. W. disclosed that her father had given her the bruises and threatened to whip her. DFACS's records reflected that when upset, the father exhibited aggressive behavior and lashed out verbally. Parker testified that on her last home visit, the house smelled of urine and had unexplained guests there. Although allegedly working at a convenience store, the father failed to furnish documentation of his employment despite numerous requests to do so. Notwithstanding his receipt of disability income and his purported employment, the father had not paid child support. Parker also stated that the father had not visited the children since August 2004 and that visits had not been scheduled with consistency or kept with regularity. In Parker's opinion, the

father was not capable of maintaining a clean home or of parenting due to his mental capacity.

Adrianne Towles, a court-appointed special advocate (CASA) program coordinator, reported that M. W. was happy with her foster parents and had developed strong bonds toward them. Towles noted that M. W. was continuing to progress academically and socially with her peers and that M. W. wanted to live "forever" with her foster parents whom she referred to as her parents. Towles also noted that D. W.'s physical health was improving and that his foster mother had observed a "marked improvement" in his seizure activity after an increase in his medication. According to Towles, D. W. had also bonded with his foster mother who had expressed a desire to adopt D. W. Towles opposed the return of the children to the father.

The children's guardian ad litem reported that the father "loves his children dearly." She concluded, however, that he was not able to care for them. The guardian reported that the children were thriving in their current foster care placements and, in her opinion, it was in the children's best interests that the father's rights be terminated and the children be allowed to be adopted.

1. The father asserts that the juvenile court erred in terminating his parental rights because the record lacks sufficient clear and convincing evidence that he had lost all rights to his children. Since the father's arguments seem to attack the sufficiency of the evidence, we address that issue first.

In determining whether to terminate parental rights, a juvenile court applies a two-step analysis:

> First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Footnote omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000); see OCGA § 15-11-94 (b) (4) (A).

As to the first factor, in unappealed orders, M. W. and D. W. were both found deprived. Because the father did not appeal those orders, he remains bound by them. See *In the Interest of K. W.*, 262 Ga. App. 744, 745 (1) (a) (586 SE2d 423) (2003). As to the second factor, the

record amply supports a finding that the lack of proper parental care is the cause of the deprivation. The father was unable to maintain a stable, safe and clean home with any consistency. As to the third factor, the father's mental and psychological limitations made it likely that the cause of the deprivation would continue and unlikely to be remedied. Dr. Holmes opined that "[i]t is unlikely that even with intensive parent education that [the father] has the capacity to become independently responsible for a child, let alone a child with special needs." Similarly, in the caseworker's opinion and that of the children's guardian, the father lacks the requisite capacity to parent properly.

As to the fourth factor, the record supports a finding that continued deprivation would likely cause serious physical, mental, or emotional harm to the children. Both M. W. and D. W. were thriving in foster care. The foster mother of M. W. attested to the bond between her and M. W. and she expressed her desire to adopt the child and provide her with the love and stability that she needs. In addition, the father's inability to control his temper, his use of physical violence to lash out at M. W., and his failure to bond with either M. W. or D. W. were likely to cause serious mental or emotional harm to the children. Also, in the separate case relating to J. W., we noted that this father, "simply lacks the mental capacity to master the skills necessary to care for [J. W.]." *In the Interest of J. W.*, 271 Ga. App. at 521. There is no reason to believe otherwise as to D. W. who likewise has severe physical and mental disabilities.

2. The father contends that the trial court erred in terminating his parental rights to M. W. because the record does not contain clear and convincing evidence that it was in M. W.'s best interest to terminate his parental rights.

To support this argument, the father cites his own testimony that he can take care of M. W.'s needs. He points out that a caseworker testified that his housekeeping was improving. He claims that the deprivation of M. W. is not likely to continue because "as M. W. gets older, she would be able to take care of her own basic needs."

Parenting is a parent's role, not that of a child. Dr. Holmes described the father as "sorely lacking in insight about his own abilities and the demands of parenthood." Moreover, "[t]he same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. [Cit.]" *In the Interest of D. L.*, 268 Ga. App. 360, 360-361 (601 SE2d 714) (2004). After reviewing the record, we conclude there was clear and convincing evidence to support the juvenile court's finding that termination

of the father's parental rights to M. W. was in the best interest of the child. See *In the Interest of T. B.*, 274 Ga. App. 147, 153 (616 SE2d 896) (2005).

3. The father contends that the trial court erred in terminating his parental rights to D. W. because the record does not contain clear and convincing evidence that it was in the best interest of D. W. to terminate his parental rights. He claims that he would be able to care for D. W. and his special needs, if the therapeutic care and services that D. W. currently receives in foster care were to be provided while D. W. is in his home. He argues that "no evidence [was] presented that D. W. even though a special needs child would suffer physical, mental, moral or emotional harm, if [his] parental rights were not terminated."

Courts are clearly authorized to consider the special needs of a child and the parent's inability to provide for those needs. See *In the Interest of J. C. J.*, 207 Ga. App. 599, 602 (428 SE2d 643) (1993). This father, unfortunately, remains mentally handicapped and continues to need assistance with the management of his own life. As we previously noted in J. W.'s case, "[a]lthough the father is capable, with significant assistance, of providing for himself, and even though he has worked diligently to fulfill his case plan, the record shows by clear and convincing evidence that he simply lacks the mental capacity to master the skills necessary to care for [these children]." *In the Interest of J. W.*, 271 Ga. App. at 521. DFACS is not "required to provide around-the-clock assistance to enable a mentally disabled parent to care for a child in the home." Id. at 521. After review, we find sufficient clear and convincing evidence to support the juvenile court's determination that terminating the father's parental rights was in the best interest of D. W. See *In the Interest of T. B.*, 274 Ga. App. at 153.

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED OCTOBER 14, 2005.

*Josephine B. Jones*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, W. Ashley Hawkins*, for appellee.