A05A1657. IN THE INTEREST OF C. L. C. et al., children.

(626 SE2d 531)

ADAMS, Judge.

Sam C., the father of C. L. C. and K. D. C., appeals the termination of his parental rights in the children. He challenges the sufficiency of the evidence and contends that termination of his parental rights is not in the best interests of the children. The mother, whose rights were also terminated, has not appealed.

On appeal from a termination order, this Court views the evidence in the light most favorable to the appellee and determines whether any rational trier of fact could have found by clear and convincing evidence that the natural parent's rights to custody have been lost. *In the Interest of S. H.*, 251 Ga. App. 555 (1) (553 SE2d 849) (2001). "We do not weigh the evidence and must defer to the trial judge as the factfinder." (Citation and punctuation omitted.) *In the Interest of C. F.*, 251 Ga. App. 708 (555 SE2d 81) (2001).

So considered, the evidence shows that on February 11, 2003, C. L. C., age 13 at the time, reported to the school counselor that his father had been physically abusive and had used drugs. When the

child returned home, the Department of Family and Children Services (DFACS) was there, and he and his brother reported what had been happening. C. L. C. reported that his father was on drugs and that he hit his mother and him. He would push them down and pull their hair, hit them with hangers, and push them into things. At times it left marks. C. L. C.'s father had hit him with the buckle end of a belt. The father eventually pleaded guilty to one count of family violence/battery for striking C. L. C. on the face with his hand and his false teeth, which scratched the child on the cheek near his eye.

At the termination hearing, C. L. C., then age 15, testified that his mother, Kathy C., is a paraplegic and that both of his parents had told him that the injury occurred when his father shot his mother with a gun. When angry, his father had often said that he wished he had shot her in the head. The boy had seen his father be violent with his mother, including pulling her from her wheelchair and throwing her out the door. His father had threatened to kill other members of the family and once cut an uncle on the nose with a knife; the wound required stitches. C. L. C. had seen his father point a gun at a man. One day while he was in school, someone called in a bomb threat. Both of his parents told him that they were responsible.

C. L. C. also testified that he had seen both of his parents use methamphetamine and regularly use marijuana. He testified that they sold drugs as well, including methamphetamine, marijuana, and prescription drugs. The abuse and drug incidents had been occurring as long as he could remember. The child also told one professional that he lied on the stand in an earlier proceeding because his father threatened to kill him if he did not lie.

Several other witnesses testified that the father had a history of violence.

A 26-year-old woman named Chassidy, who is currently serving a life sentence for murder for shooting her aunt when she was 14 years old, testified that Sam C. was her father. Chassidy testified that Sam C. and her mother were once married, that he beat her mother, and that he beat her with the buckle end of a belt when she was about seven years old, which left bruises all over her body. Chassidy's stepfather took pictures of the girl's injuries at the time, and they were introduced into evidence. She testified that Sam C. admitted for the first nine or ten years of her life that she was his child, but he then began to deny it. At a point when Chassidy lived with Sam C. and Kathy C., she saw Sam beat Kathy and push her out of her wheelchair. She also testified that Sam C. has a history of drinking until becoming drunk and using drugs.

Sam C.'s mother testified that Sam had threatened to kill her in the past, including as recently as two months before the termination

hearing. Sam C. had also told her that he had once cut another man with a knife. He had also told her that he shot Kathy C.

Sam C. had threatened to kill his half-sister on many occasions, once as recently as one year prior to the hearing, and had threatened to burn her house down. At one point, her red car inexplicably caught fire two or three days after Sam C. told her that he would "fix [her] little red wagon." Sam C. told his half-sister that he had caused his wife to be a paraplegic. His half-sister had seen him point his gun at many people. Finally, Sam C. took a warrant out for her arrest, alleging that she kidnapped the children at a time that they were in the care of DFACS.

Yet another witness testified that Sam C. used to brag that he shot Kathy C., causing her partial paralysis, and that Sam once set a fire in his own house after getting mad during a conversation.

Sam C. acted in a threatening manner toward a customer at his job only months before the termination hearing. He had acted in a threatening manner with one of C. L. C.'s teachers. He had harassed people involved with the case, including telling them that federal warrants were out on them, confronting them in public places and accusing them of lying and calling the police on professionals involved in the case who were merely doing their job. Sam C. told a social services caseworker that there were federal warrants out for his arrest, and he left numerous threatening phone messages for him. Sam C.'s actions have been characterized as intentional, belligerent, and very uncooperative. He told one caseworker that everyone involved was going to pay for what has happened to the boys. Finally, authorities had to move the children from their first placement to another location because the parents' behavior caused concern about the safety of the staff and the other children.

The evidence also shows that the father failed to comply with the reunification plan, including the requirement that he submit to random drug tests despite five requests. Despite completing a parenting course, Sam C. has not demonstrated improved parenting skills. Certain family counseling was not completed. The children's parents had not paid child support from March 2004 through the hearing, which took place in November and December 2004. They owed $2,227 at the time of the hearing. Sam C. also had an unclear recent employment history and had failed to provide requested check stubs to show stable employment as required by the plan.

The psychologist who examined the children six or seven times between September 2003 and September 2004 testified that C. L. C. told him essentially the same story that he testified to about his father's abuse, anger, violence and drug use. The psychologist diagnosed C. L. C. with "adjustment disorder with anxiety and depression," which he described as a nonsevere, temporary disruption of the

child's emotional adjustment, but over the course of time C. L. C. improved to the point of being no longer depressed or anxious to a significant degree. But, despite this improvement, the psychologist did not believe the child was ready or willing to be reunited with his parents. Also, C. L. C. was fearful that if there was unsupervised visitation, his parents would try to manipulate him or run away with him; and he was fearful that he would be mistreated again, including that his father would continue to beat him. C. L. C. never wants to see his parents again, and he wanted the court to terminate his parents' rights.

K. D. C. also reported an extended history of physical abuse toward him and his brother, and he feared being reunited with his parents as well. He reported other facts similar to his brother's story. The child also reported that his father had threatened to kill folks if they told authorities that he used drugs. K. D. C. continued to be fearful of being reunited because the beatings might resume.

Dr. Karasievich, a clinical psychologist, evaluated the parents in May and June 2003. He testified that the father had "low intellectual functioning," denial of substance abuse and depression, and that he tested as being paranoid, delusional, schizoid and narcissistic. The father blamed other people for lying about him. The doctor diagnosed delusional disorder, which he described as meaning somewhat delusional and having a mixed personality disorder. The father's personality was consistent with rough behavior and lying or blaming others for his troubles. The doctor opined that it is typical for violent offenders to never admit their behavior even if convicted. Sam C. denied ever being violent, and told the psychologist, "[t]hey all lied about me to DFCS."

At the termination hearing, Sam C. denied all past violence. He believes that the entire affair is a conspiracy and that all the witnesses are lying about him. He claims he lied when he pled guilty to family violence. Witnesses testified that he denied being the father of Chassidy.

There was testimony that the children are still deprived and that deprivation would be likely to continue if they were returned to their parents. C. L. C. did not believe that his parents would ever change. They had told him that the violence did not happen and that it was not their fault. A phone call from his father while he was in foster care caused one boy to have nightmares and to wet his bed.

In determining whether to terminate parental rights, a juvenile court applies a two-step analysis:

First, there must be a finding of parental misconduct or inability, which requires clear and convincing evidence that: (1) the child is deprived; (2) the lack of proper parental care

or control is the cause of the deprivation; (3) the cause of the deprivation is likely to continue; and (4) continued deprivation is likely to cause serious physical, mental, emotional, or moral harm to the child. If these four factors exist, then the court must determine whether termination of parental rights is in the best interest of the child, considering the child's physical, mental, emotional, and moral condition and needs, including the need for a secure, stable home.

(Footnotes omitted.) *In the Interest of V. M. T.*, 243 Ga. App. 732, 735-736 (3) (534 SE2d 452) (2000); see OCGA § 15-11-94 (b) (4) (A).

1. *Parental Misconduct or Inability.* We find that there was clear and convincing evidence to support a finding by the juvenile court of parental misconduct or inability based upon the statutory factors. Only the evidence related to the father will be presented.

(a) Deprivation. Because the father did not appeal the juvenile court's order finding that the children were deprived, he is bound by that determination. *In the Interest of B. L. S.*, 239 Ga. App. 771, 774 (521 SE2d 906) (1999).

(b) Lack of proper parental care or control as a cause of deprivation. In connection with the original deprivation order, the father has admitted that his failure to provide proper care or control caused the children's deprivation. The father's failure to appeal the deprivation order renders the juvenile court's determination on this second factor binding. *In the Interest of A. G.*, 253 Ga. App. 88, 89 (1) (b) (558 SE2d 62) (2001); *In the Interest of R. G.*, 249 Ga. App. 91, 93 (1) (a) (547 SE2d 729) (2001). Furthermore, the record amply supports a finding that the lack of proper parental care caused the children's deprivation.

(c) The cause of the deprivation is likely to continue. "[E]vidence of past unfitness, standing alone, is insufficient to terminate the rights of a parent in [his or] her natural child; clear and convincing evidence of *present* unfitness is required." (Citations and punctuation omitted; emphasis in original.) *In the Interest of K. M.*, 240 Ga. App. 677, 680 (523 SE2d 640) (1999). "But the trial court is entitled to consider evidence of the [father's] past actions in determining whether the deprivation is likely to continue. It is not bound by mere promises to do better in the future." (Citations omitted.) *In the Interest of A. M.*, 259 Ga. App. 537, 542 (578 SE2d 226) (2003).

Here clear and convincing evidence was presented to show that the deprivation was likely to continue. Evidence was presented to show that the father's violent and abusive behavior was wide ranging and current. He was belligerent and threatening to caseworkers and family members alike, with incidents occurring within two months of the termination hearing. He also denied all violent and abusive behavior despite considerable evidence. He threatened one child in

an effort to obtain favorable testimony. And testimony was presented that the father's parenting skills had not improved and that the children's deprivation was likely to continue. Although the father had completed an anger management course, the trial court was authorized to conclude that the father had not changed his ways and that his abusive and violent behavior was likely to continue.

(d) Continued deprivation is likely to cause serious physical, mental, emotional or moral harm to the child. "[I]t is not automatically true that a finding that deprivation is likely to continue will support a finding that continued deprivation will harm the child." *In the Interest of J. T. W.*, 270 Ga. App. 26, 37 (606 SE2d 59) (2004). But in this case, given the nature of the father's violent and abusive behavior to those around him, the trial court was authorized to conclude that serious physical, mental, emotional or moral harm would result if the children were returned to their father.

2. *Best Interest of the Child.* The evidence presented at the hearing and discussed above supports the juvenile court's conclusion that terminating the father's parental rights was in the best interests of the children. "The same factors that show the existence of parental misconduct or inability may also support the juvenile court's finding that terminating the parent's rights would be in the child's best interest. [Cit.]" *In the Interest of D. L.*, 268 Ga. App. 360, 360-361 (601 SE2d 714) (2004). After reviewing the record, we conclude there was clear and convincing evidence to support the juvenile court's finding that termination of the father's parental rights was in the best interests of the children. See *In the Interest of T. B.*, 274 Ga. App. 147, 153 (616 SE2d 896) (2005).

*Judgment affirmed. Smith, P. J., and Ellington, J., concur.*

DECIDED JANUARY 20, 2006.

*Jerry W. Moncus*, for appellant.

*Thurbert E. Baker, Attorney General, Shalen S. Nelson, Senior Assistant Attorney General, Charissa A. Ruel, Assistant Attorney General, Richard K. Murray*, for appellee.